Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7645 | **DATE** | 9/24/2002 |
| **CASE TITLE** | Steiner vs. Glenn | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Motion of plaintiff Leonard M. Steiner, Jr. to vacate arbitration award is denied. Judgment is entered in favor of defendant Paul F. Glenn and against plaintiff Leonard M. Steiner, Jr.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 3 number of notices | **Document Number** |
| | No notices required. | | |
| X | Notices mailed by judge's staff. | SEP 25 2002 date docketed | |
| | Notified counsel by telephone. | | 12 |
| | Docketing to mail notices. | | |
| X | Mail AO 450 form. Mailed by MD. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 9/24/2002 date mailed notice | |
| MD | courtroom deputy's initials | MD mailing deputy initials | |
| | Date/time received in central Clerk's Office | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LEONARD M. STEINER, JR., | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 00 C 7645 |
| | ) Judge Joan H. Lefkow |
| PAUL F. GLENN | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Leonard M. Steiner, Jr. ("Steiner"), moves pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., to vacate an arbitration award in favor of defendant, Paul F. Glenn ("Glenn"), in *Glenn v. Steiner*, 98-ARB-148 (NFA).[1] Jurisdiction is properly invoked under 28 U.S.C. § 1332 (diversity jurisdiction). For the reasons set forth herein, the court denies Steiner's motion.

## FACTS AND PROCEDURAL HISTORY

SEP 25 2002

Steiner is a commodity trading advisor ("CTA") registered with the Commodity Futures Trading Commission ("CFTC") and a member of the National Futures Association ("NFA").[2] In

---

[1] Steiner filed a "complaint" instead of a "motion," however, the court treats the complaint as a motion to vacate the arbitration award in accordance to 9 U.S.C. §§ 6, 10(a). *Accord Farmers Nat'l Bank of Geneseo v. Van Kampen Merrit, Inc.*, No. 91 C 5653, 1992 WL 80516, at *1 (N.D. Ill. April 13, 1992) (Andersen, J.) ("The fact that this motion came before the district court on the application (rather than the motion) of [the plaintiff] to vacate the arbitration award . . . does not affect our disposition of this case").

[2] The CFTC "was created by Congress in 1974 as an independent agency with the mandate to regulate commodity futures and option markets in the United States." *The CFTC at a Glance*, http://www.cftc.gov/cftc/cftcglan.htm. It consists of five Commissioners appointed by the President with the advice and consent of the Senate to serve staggered five year terms. *Id.* Its mission is to protect "market participants against manipulation, abusive trade practices and fraud." *Id.*

1



March, 1997, Steiner solicited Glenn[3] to open an account in the amount of $50,000 over which Steiner had discretionary trading authority to invest in the commodity futures industry. Specifically, Steiner purchased futures contracts[4] including ones on the Standard & Poor's 500 Index (the "S&P 500 futures contracts"). Saul Stone & Company ("Saul Stone"), a registered futures broker located in Chicago, held the account. As required by the CFTC and the NFA, Steiner provided Glenn with a detailed disclosure document (the "disclosure agreement") that described Steiner's trading strategy, including the risks involved with his strategy. (Pl. Ex. 5.)

From March 27 to October 23, 1997, Steiner's trades resulted in Glenn's account increasing from $50,000 to over $446,000. (Pl. Exs. 8, 9, 11 *Saul Stone v. Glenn*, No. 1-98-4628, at 2.) On October 24, however, Steiner's trades resulted in losses to Glenn's account. (Pl. Ex. 11 at 2.) On October 27, the U.S. stock market (as well as the S&P 500 Index) experienced its largest single-day decline in history.[5] (Supplemental Mot. at 7.) Nevertheless, Steiner purchased more S&P 500 futures contracts for Glenn that would profit from an expected rebound but would sustain losses if the market continued to decline. (*Id.*) Unfortunately, the market

---

The NFA is a self-regulated association in the commodity futures industry.

[3]Steiner describes Glenn as "one of the largest and [most] sophisticated individual professional commodity traders in the world" and "by nature a very aggressive commodity trader." (Supplemental Mot. at 2; *see* Pl. Ex. 1.) Further, Steiner states that Glenn "maintains between 35 and 50 commodity trading accounts at virtually every commodity broker in the country." (Pl. Exs. 2, 3.)

[4]A "futures contract" is

[a]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) which obligates each party to the contract to fulfill the contract at the specified price; (3) which is used to assume or shift price risk; and (4) which may be satisfied by delivery [the tender and receipt of the cash value of the commodity used to settle the futures contract] or offset.

*The CFTC Glossary*, http://www.cftc.gov/opa/brochures/opaglossary.htm.

[5]Indeed, for the first time, the trading losses set off the New York Stock Exchange circuit breakers established during the 1987 market crash. (Supplemental Mot. at 6.)

2

continued to decline and eventually Steiner placed orders to "offset" the "position."[6] Nonetheless, by the end of October 27, Glenn had a substantial debit balance in his account.

Glenn initially refused to pay the debit balance to Saul Stone. Saul Stone instituted a collection action, *Saul Stone v. Glenn*, No. 97 L 14097, against Glenn in the Circuit Court of Cook County, Illinois. Saul Stone deposed Glenn and questioned him about Glenn's and his other CTAs' trades in the commodity futures industry. (Pl. Ex. 4 Glenn Dep. at 14-41.) Glenn testified that he and his other CTAs did some trades in S&P 500 futures contracts. (*Id.* at 19-25.)

On August 27, 1998, Glenn filed a Demand for Arbitration with the NFA against Saul Stone and Steiner. (Pl. Ex. 13 *Glenn v. Steiner*, No. 98-ARM-118.) In his demand against Steiner, Glenn alleged (1) Steiner violated the fraud prohibitions of § 4b of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, by placing under-margined[7] trades in Glenn's

---

[6]"Offset" means "[l]iquidating a purchase of futures contracts through the sale of an equal number of contracts of the same delivery month [when the contract matures], or liquidating a short sale of futures through the purchase of an equal number of contracts of the same delivery month."

"Position" means "[a]n interest in the market, either long or short, in the form of one or more open contracts."

*The CFTC Glossary*, http://www.cftc.gov/opa/brochures/opaglossary.htm.

[7]A "margin" is

[t]he amount of money or collateral deposited by a customer with his broker, by a broker with a clearing member, or by a clearing member with the clearinghouse, for the purpose of insuring the broker or clearinghouse against loss on open futures contracts. The margin is not partial payment on a purchase. (1) Initial margin is the total amount of margin per contract required by the broker when a futures position is opened; (2) Maintenance margin is a sum which must be maintained on deposit at all times. If the equity in a customer's account drops to, or under, the level because of adverse price movement, the broker must issue a margin call [a request from a brokerage firm to a customer to bring margin deposits up to initial levels] to restore the customer's equity.

*The CFTC Glossary*, http://www.cftc.gov/opa/brochures/opaglossary.htm.

An "under-margined account" lacks sufficient funds to meet margin requirements and results in a margin call. *Id.*

3

account; (2) Steiner committed negligence with his trades in violation of (unspecified) industry rules, regulations and the disclosure agreement; (3) Steiner breached his fiduciary duty by trading negligently and in excess of the authority granted to him under the disclosure agreement; (4) Steiner breached the disclosure agreement on October 27, 1997 by placing under-margined trades in Glenn's account; and (5) Steiner violated NFA's Compliance Rule 2-4 of commercial honor and just and equitable principles of trade in his conduct.[8]

The three-member arbitration panel (the "panel") ordered that June 30, 2000 was the due date for requesting documents and written information. (Pl. Ex. 15 ¶ 2(2).) However, on July 5, 2000, Steiner requested Glenn to produce records including his commodity trading activities from 1990 to 2000. (Pl. Ex. 16.) Glenn complied in part with the request but refused to provide his records on his and his other CTAs' trades from 1997 to 2000. On October 6, Steiner requested the panel make Glenn produce these records and to issue subpoenas to Glenn's other brokers to independently obtain the same records. (Pl. Ex. 18.) On October 20, the panel denied Steiner's request.

On October 25 and 26, the panel held the arbitration hearing. At the hearing, both parties and their respective experts testified. (Supplemental Mot. at 10.) Glenn testified that Steiner's trades went beyond the terms and risks stated in the disclosure agreement. Glenn's expert testified that Steiner should not have purchased the S&P 500 futures contracts on October 27, 1997 and also should have liquidated those contracts earlier. (*Id.*) Steiner testified about his strategy prior to and on October 27. (*Id.*) Steiner's expert testified that Steiner's trades were within the bounds of the disclosure agreement and that his strategy on October 27 was "rational

---

[8] Glenn eventually settled with Saul Stone on the collection action and arbitration demand.

4

and legitimate" given his discretionary trading authority. (*Id.*)

During the hearing, Steiner's counsel questioned Glenn about his and his other CTAs' trades on October 27. (*Id.*) Steiner's counsel subsequently requested the panel to reconsider his earlier request for records but limited to records on Glenn's and his other CTAs' trades in S&P 500 futures contracts during 1997. (Pl. Ex. 20 Partial Arbitration Tr.) Steiner argued that the records were relevant because if Steiner could show that Glenn's and his other CTAs' trades were similar to Steiner's trades, then he could establish (1) the reasonableness of his trades if Glenn traded the same way as Steiner and was not "attacking" the other CTAs' trades and (2) that Glenn's credibility was in question based on Glenn's earlier deposition testimony in the Illinois collection action. (Supplemental Mot. at 10-11.)

The panel denied Steiner's request. With respect to Glenn's trades, the chairman of the panel stated that:

> Mr. Glenn does not have a fiduciary duty to himself. He has a profit motive but . . . that's not the same. Mr. Steiner clearly is trying to get money for Mr. Glenn's account, but layer[ed] over that is this concept of duty, which is a different kind of thing. So, I understand [Steiner's counsel's] point that they are close and coincidental, but I just don't think that Mr. Glenn's trades are really significantly probative of what a breach of duty might be.

(Pl. Ex. 20 at 7.) With respect to Glenn's other CTAs' trades, the chairman determined that:

> . . . we [do not] want to engage in now concentric circles of proof of what happened by another [CTA] and another account and a third and a fourth and a fifth and a sixth because . . . you're inviting a never-ending parade of judgments and decisions and so on and we have to make a decision, as difficult as it is, of what happened in this situation between these two people under these circumstances.

(*Id.* at 8.) The chairman also referred to the panel's denial of Steiner's earlier request, stating that that request had been untimely. (*Id.* at 9-10.) Moreover, the chairman recognized that Steiner's counsel had earlier questioned Glenn about his trades in other accounts. (*Id.* at 15.)

5

On November 3, 2000, the panel signed an arbitration award (the "award") in favor of Glenn and on November 28, the NFA served the award to the parties. On that same day, the NFA also published the award on its public website. On November 29, however, Steiner's counsel contacted the NFA arbitration administrator to object that the panel had not yet ruled on the award within 30 days after the closing of the arbitration hearing, as required by NFA Arbitration Rules. (Pl. Ex. 22.)

On December 5, 2000, Steiner filed the instant motion to vacate the award.

**DISCUSSION**

Steiner alleges that pursuant to 9 U.S.C. § 10(a)(3) the court must vacate the award because the panel (1) engaged in misconduct by refusing to hear evidence "pertinent and material" to the controversy and (2) rendered the award untimely in violation of the NFA Code of Arbitration.

Arbitration "is a private system of justice offering benefits of reduced delay and expense." *Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1254 (7th Cir. 1994). "Factual or legal errors by arbitrators--even clear or gross errors--do not authorize courts to annul awards." *Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 333 (7th Cir. 1995) (internal citations and quotations omitted). "Nor does an insufficiency of evidence supporting the decision permit [the court] to disturb the arbitrator's order." *Eljer Mfg., Inc.*, 14 F.3d at 1254. Instead, "[a] restrictive standard of review is necessary to preserve these benefits and to prevent arbitration from becoming a 'preliminary step to judicial resolution.'" *Id.*, quoting *E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Ass'n of E. Chicago, Inc.*, 790 F.2d 611, 614 (7th Cir. 1986). Thus, a court will vacate or modify an award only as stated in sections 10 and 11 of the FAA, 9

6

U.S.C. §§ 1 *et seq.*, or if the arbitrator deliberately disregards the law.[9] *Eljer Mfg., Inc.*, 14 F.3d at 1253-54.

## A. The panel's refusal to permit discovery of Glenn's and his other CTAs' trades

Under 9 U.S.C. § 10(a)(3), the court may vacate an award when the arbitrators are "guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy[.]" Steiner asserts that the records on Glenn's and his other CTAs' trades during the same time period as Steiner's trades were "pertinent and material" evidence and that the panel's denial of his request for those records deprived him of a fair hearing. (Supplemental Mot. at 15.) He argues that if Glenn traded the same way as he, then Steiner could have established the reasonableness of his own conduct on October 27, 1997. (*Id.*) Further, Steiner contends that if

---

[9]Section 10 of the FAA provides, in relevant part,

> . . . the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. . . .

9 U.S.C. § 10(a).

Section 11 of the FAA provides, in relevant part,

> . . . the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration--
> (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
> (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
> (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
> The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. § 11.

Glenn's other CTAs traded the same way as Steiner had traded and if Glenn did not "attack" them, then Steiner could have demonstrated that "Glenn does not believe that [Steiner] acted improperly." (*Id.*) Moreover, Steiner asserts that these records could have been relevant to the panel's determination of Glenn's credibility. (*Id.* at 15-16.)

To support his assertions, Steiner cites to several cases from other circuits where the courts declined to enforce an award or vacated an award. See *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (vacating an award after finding that the panel engaged in misconduct because it had "no reasonable basis" to determine the defendant-manufacturer's only witness concerning both parties' fraudulent inducements claims would provide cumulative evidence); *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992) (affirming the lower court's denial of enforcement of an award because the arbitrator changed the evidentiary rules during the hearing, which prevented the defendant from presenting its documentary evidence); *Hoteles Condado Beach v. Union De Tronquistas*, 763 F.2d 34, 40 (1st Cir. 1985) (affirming the lower court's vacation of an award where the arbitrator refused to give any weight to the plaintiff employer's evidence that was "central and decisive" to the plaintiff's position that the defendant employee engaged in misconduct, which resulted in his discharge); *Hall v. Eastern Air Lines, Inc.*, 511 F.2d 663, 663-64 (5th Cir. 1975) (affirming the lower court's denial of enforcement of an award because the panel refused to consider the plaintiff's only evidence that he was was wrongfully discharged because the plaintiff "was tardy in presenting it"). Steiner argues that each of these cases is identical to the instant case because the panel refused to permit Steiner to discover and present evidence "most pertinent" to Glenn's claims, which is "Glenn's own substantially parallel trading in precisely the same investments." (Supplemental Mot. at 16.)

8

Steiner's cases are factually distinguishable from the instant case. *Cf. Generica Ltd.* v. *Pharmaceutical Basics, Inc.*, 125 F.3d 1123, 1131 (7th Cir. 1997) ("Although there have been cases in which an arbitrator denied a party the opportunity to a meaningful hearing, this cannot be considered one of them[,]" citing the aforementioned cases). Unlike Steiner's cases where the arbitrators prevented the moving party from presenting the *only* evidence that was probative to establish or defend against the claims, Steiner had other evidence to support his defense. For example, the chairman noted that Steiner had already questioned Glenn about his trades. Indeed, Steiner concedes that he questioned Glenn about his and his other CTAs' trades on October 27, 1997. (Supplemental Mot. at 10.) Steiner also had Glenn's deposition testimony from the prior Illinois collection action, which he could use to impeach Glenn's credibility during his cross-examination. Further, although not stated by the chairman, the testimony of Steiner and his expert would support the "reasonableness" of Steiner's trades in defense of Glenn's claims against him.

Moreover, unlike Steiner's cases in which the courts considered the excluded evidence to be "central and decisive" to the moving party's claims or defense, *e.g., Hoteles Condado Beach*, 763 F.2d at 40, Steiner does not establish that the requested records would be central and decisive to his defense. *See International Bhd of Elec. Workers* v. *Commonwealth Edison Co.*, No. 92 C 1478, 1993 WL 68105, at *6-7 (N.D. Ill. Mar. 10, 1993) (declining to vacate the award under 9 U.S.C. § 10(a)(3) because the arbitrator had discretion to decide procedural matters such as evidentiary matters and the record was "neither barren nor devoid of the most significant evidence"). The chairman determined that Steiner's request for the records was not only untimely but also not probative. The chairman specified that the panel had to examine Steiner's duty to Glenn and not Glenn's duty to himself. Further, the chairman recognized that how

9

Glenn's other CTAs traded would divert the panel from its central task of examining what happened between Steiner and Glenn. Reviewing courts always give considerable deference to the trier of fact on issues of relevance and admissibility, and deference to the arbitrator is arguably even greater. *See., Vita Food Prod., Inc. v. Sklar*, No. 94 C 5798, 1995 WL 360696, at *6 (N.D. Ill. June 13, 1995) (Leinenweber, JACPG.) (The court "is not authorized to disturb the [p]anel's findings as to the relative credibilities of each side's witnesses"; "it is not this court's place to weigh the evidence independently" [citing Seventh Circuit cases and adding,] "Even clear errors of fact or law do not supply valid grounds for vacating an arbitration award."). Where, as here, the evidence would have been cumulative, the arbitrator's decision on the matter was reasonable and certainly not within the restrictive standard of "misconduct."

Accordingly, the court declines to vacate the award pursuant to 9 U.S.C. § 10(a)(3).

### B. The NFA Code of Arbitration

Steiner next contends that he was substantially prejudiced when the panel failed to timely render the award within 30 days as required by the NFA Code of Arbitration (the "Code"). Section 10(a) of the Code provides,

> [w]ithin 30 days after the record is closed, the Panel shall render its award, in writing, dated and signed by the Panel members, which shall be delivered to NFA, who shall promptly serve a copy on each party or its representative either personally or by certified mail. The award shall be that of the Panel majority.

The Code, *available at* http://www.nfa.futures.org/dispute/M7CodeArb_j.html#S10a.

Under § 10(a), the panel had until November 27, 2000 to timely render its award after the close of the hearing on October 26.[10] Steiner argues that the panel rendered the award late on November 28. Glenn responds that the panel timely rendered the award on November 3 when the panel signed the award.

The NFA provides no definition for the term "render." Glenn relies on the definition of "render judgment," which occurs "when [the] decision is officially announced, either orally in open court or by memorandum filed with clerk." BLACK'S LAW DICTIONARY at 1296 (6th ed. 1990). However, although the panel signed the award on November 3, there is no evidence that the panel "officially announced" the award until November 28 when the NFA served a copy of the award to the parties and published on its website. As such, the panel did not "render" its award on November 3 but on November 28.

Anticipating that the court may find the award untimely, Glenn contends that the award is still enforceable (i.e. the panel did not lose its jurisdiction by rendering the award late). In *Hill v. Norfolk and Waster Ry. Co.*, 814 F.2d 1192, 1199 (7th Cir. 1987), the court held, in part, that although the parties' agreement provided that the panel "'shall . . . render an award . . . within thirty (30) days after the close of the hearing[,]'" the panel's two-month delay did not render the award void because the agreement did not make the deadline jurisdictional. Further, the court determined that there was "no suggestion that [the plaintiff] either was harmed by the two-month delay or complained after the deadline passed." *Id.* The court concluded that "[u]nless the agreement itself makes the deadline jurisdictional, a party's failure to complain about delay

---

[10]Section 16(a)(2) of the Code provides "[t]he counting of days shall include all calendar days. Should a due date fall on a weekend or legal holiday such due date will be compiled as the next business day on which mail is delivered." http://www.nta.futures.org/dispute/M7CodeArb_p.html#516a. November 25 is actually 30 days from the close of the record but it fell on a Saturday in 2000.

11

before the award is made forfeits his right to challenge the timeliness of the award." *Id.*

Section 10(a) of the Code is similar to the parties' agreement in *Hill*, which establishes that the 30-day deadline is not jurisdictional. Moreover, Steiner does not point to (nor does the court find) any provision in the disclosure agreement between Steiner and Glenn that makes § 10(a) of the Code jurisdictional. Nonetheless, Steiner contends that he complied with *Hill* "because, even if the NFA's [Code] . . . do[es] not make the timeliness of an award jurisdictional, Mr. Steiner . . . objected to the delay[.]" (Supplemental Mot. at 17.) Further, Steiner asserts that he was "substantially prejudiced by" the untimeliness of the award because he was prevented "from searching for and finding new employment in the face of a takeover of his company." (*Id.*)[11]

The court, however, finds that Steiner has not complied with *Hill*. Steiner objected to the award *after* it was rendered on November 28. Moreover, Steiner fails to show how *one extra day* past the 30-day deadline prejudiced him in his job search to such an extent that the court must vacate the award. Based on these facts, Steiner's motion is denied on this ground.

---

[11]During the same time as the arbitration proceedings, besides being a CTA, Steiner was an employee at Jac-Pac Foods, a subsidiary of IBP, Inc., a beef packing house. Steiner believed his continued employment with Jac-Pac Foods was uncertain because IBP, Inc. was subject to a takeover bid from Tyson Foods. In light of this, Steiner actively sought alternative employment in the beef processing industry. During the arbitration proceedings, however, Steiner did not engage in a "realistic job search" because he did not know what his financial status would be pending the outcome of the arbitration. (Pl. Ex. 23 Steiner Decl. ¶¶ 4, 5.) Steiner was concerned that he would receive an award against him, which would cause him to file for bankruptcy and make him "unemployable in the beef processing industry." (*Id.* ¶ 6.) In early December, when Steiner received the award against him, the job opportunities had already "dried up" in the industry. (*Id.*)

12

## ORDER

Steiner's motion to vacate the award is denied. The clerk is directed to enter judgment in favor of Glenn.

ENTER: /s/ Joan H. Lefkow
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: September 24, 2002